**MICHAEL C. BAXTER**, Oregon State Bar ID Number 91020
michael@baxterlaw.com
**JUSTIN M. BAXTER.** Oregon State Bar ID Number 99217
justin@baxterlaw.com
Baxter & Baxter, LLP
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon 97225
Telephone (503) 297-9031
Facsimile (503) 291-9172
    Attorneys for Plaintiff Valentine

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| **REBECCA L. VALENTINE**, | Case No. 05-CV-0801-JO |
| Plaintiff, | **PLAINTIFF'S RULE 26(a)(2) DISCLOSURE** |
| v. | |
| **EQUIFAX INFORMATION SERVICES LLC**, a foreign corporation, | |
| Defendant. | |

Pursuant to Fed. R. Civ. P. 26(a)(2) plaintiff Rebecca L. Valentine discloses that Evan Hendricks may be called at trial as an expert witness.  Mr. Hendricks' written report is attached hereto.

Dated this 11th day of July, 2007.

    /s/ Justin M. Baxter

    _____
    Justin M. Baxter, OSB #99217
    (503) 297-9031 (Telephone)
    (503) 291-9172 (Facsimile)
    justin@baxterlaw.com
    Of Attorneys for plaintiff Valentine

## PLAINTIFF'S RULE 26(a)(2) EXPERT WITNESS REPORT

I, Evan Hendricks, provide the following Expert Report pursuant to Federal Rules of Civil Procedure 26(a)(2) in connection with the action entitled <u>Rebecca L. Valentine. v. Equifax Credit Information Services, et al.</u>: U.S. District Court for the District of Oregon; No. CV 05-801-JO.

### Introduction & Executive Summary

This report provides a detailed analysis of what went wrong in Mrs. Valentine's case, and why, and provides important historical context.

But the clinical tone is not intended to mask my strong opinion that Equifax's conduct in Mrs. Valentine's case was egregious and inexcusable. Equifax knew generally that identity theft causes chronic credit report inaccuracy that is harmful to consumers on several levels. Equifax knew since at least 2001 that Mrs. Valentine was a victim of identity theft. Equifax has been on notice for years that too often its standard practices and procedures facilitate identity theft inaccuracy, both in allowing fraudulent data to pollute the credit reports of innocent victims, and in failing to adequately investigate disputed data and remove obvious errors, and in failing to prevent predictable inaccuracies from continuing to be included in the victim's credit report. Equifax has represented in the past that it would cure the types of deficiencies that were central to Mrs. Valentine's inaccuracies and other problems.

But the fact is that Equifax did not adequately cure its deficiencies, and that Mrs. Valentine suffered the consequences. This case demonstrates that Equifax has stubbornly clung to discredited practices and/or procedures. A significant reason is that Equifax declines to invest in the *human* resources necessary to resolve more complex cases like Mrs. Valentine's, and instead, has increasingly relied upon automation and the outsourcing of dispute processing to foreign countries.

Considering that Congress demanded that Equifax and other consumer reporting agencies (CRAs) " … [E]xercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy," it is unconscionable that a legal person like Equifax did what it did to a natural person, like Mrs. Valentine. Even more unconscionable is that Equifax still believes that its treatment of Mrs. Valentine was not all that harmful, and that its conduct did not in any way violate the FCRA – even though Federal juries and Courts have found that similar conduct was both harmful to the victim and in violation of the FCRA. Perhaps most troubling is that Equifax shows no indication that it will make the systemic changes necessary to avoid doing to other consumers what it did to Mrs. Valentine.

Identity theft, credit reporting and credit scoring are modern and complex issues that are not well understood by the general public. This report explains how and why Equifax's system failed Mrs. Valentine, and why Equifax knew or should have known that it would fail her.

1

## Summary of Opinions

1.  As in other cases of chronic inaccuracy, Equifax consistently failed to follow its own *stated* policies and procedures, resulting in continued failure to correct obvious errors in Mrs. Valentine's credit reports.  Considering that this is what occurred in previous cases, this indicates that Equifax has not learned from its past failings, and/or simply doesn't care enough to correct its past failings.

2.  The policies/procedures that Equifax failed to follow, or which failed to result in correction of Mrs. Valentine's erroneous data when followed, included, but were not limited to:
    A.  "One Fraud, All Fraud" (i.e., "Verified Victim")
    B.  The "ACDV exchange"
    C.  Requiring two identifiers to match, not including SSN, to "verify" fraud dispute
    D.  Suppression/blocking of  inaccurate, deleted data in light of Multiple Files
    E.  Continued 'Partial Matching' after notice of identity theft
    F.  Maintenance Reviewer as Last Line of Quality Control
    G.  Equifax Doesn't Know Why Its Policies Were Not Followed

3.  As in other cases of chronic inaccuracy, Equifax failed to carefully consider Mrs. Valentine's disputes.  This failure relates to Equifax's failure to devote sufficient resources to dispute handling and to its failure to have in place a mechanism for recognizing that some disputes are more complex and deserve greater time and attention.  It also relates to the manner in which Equifax increasingly relies on automation.

4.  Equifax fails to utilize important internal documents, like online combine reports and frozen data scans, in resolving complex and long-running consumer disputes, even though these very same documents are regularly used in this case and other litigation to discover what went wrong.

5.  Neither its investigations department [Fluellen], nor its computer systems department [Annette Simpson] attempts to recognize duplicate collection accounts, despite striking similarities in account numbers and reporting.

6.  Despite its knowledge that identity theft is a long-standing and prevalent phenomenon that can threaten credit report accuracy, Equifax makes no system-wide effort to identify signs of identity theft or prevent fraudulent data from entering a consumer's file.

7.  Absent a federal lawsuit, errors in Mrs. Valentine's Equifax reports would have persisted.

8.  The consistent pattern of Equifax's failures between past cases and Mrs. Valentine's, coupled with the results of previous cases and with Equifax's position in this case, confirms that Equifax does not plan to make changes that would effectively address

2

the types of chronic inaccuracy problems that plagued Mrs. Valentine, and which were identified by the Federal Trade Commission and the State Attorneys General in the early 1990s.

9. The kinds of damages stemming from identity theft and chronic inaccuracy were well-known to Equifax long before Mrs. Valentine's case arose. Mrs. Valentine's damages were consistent with other victims of identity theft and chronic inaccuracy.

10. The nature and purpose of credit scores and credit reports.

11. The history of credit report inaccuracy and CRA non-responsiveness, including that caused by identity theft.

## Equifax Failed to Carefully Consider Mrs. Valentine's Disputes

For a CRA like Equifax to adequately resolve a consumer's dispute, it is necessary to understand the nature of the dispute so it can deduce what investigative and corrective steps its needs to take. To understand the nature of the dispute, Equifax needs to carefully consider it. An initial failure in Mrs. Valentine's case was that Equifax did not carefully consider Mrs. Valentine's dispute. The failure to carefully consider a consumer's request in part relates to Equifax's failure to employ adequate numbers of dispute operators and properly organize them, and its failure to have in place a mechanism for recognizing that some disputes are more complex and deserve greater time and attention.

According to prior deposition testimony, Equifax employees or agents must process a large volume of disputes per day. This leaves the Equifax employees or agents with only a few minutes to process each disputed item. To handle this volume, Equifax employees or agents use a system of entering a two-digit code describing the consumer's dispute, which is then sent via computer to the furnisher of the information.

Another potential reason for Equifax's lack of careful consideration is that they "outsource" dispute processing. The outsourced dispute processors are paid mainly according to volume. The main "quality" they are graded on is the extent to which the results of a reinvestigation reflect what the credit grantor has instructed Equifax to put on a credit report.

There were several instances in which Equifax's lack of careful consideration was tied to its failure to correct obvious errors in Mrs. Valentine's reports. For example, in response to a 2004 dispute over a fraudulent RMA Collection, Equifax testified that it failed to remove the account "because it doesn't appear as though, to be quite honest, the details were paid attention to." [Fluellen, pg. 91] Another example: Equifax transmitted the fraudulent "Spotted Horse" address on an ACDV it sent to a collector, long after it was informed that it was a fraudulent address. [Fluellen, pgs. 87-88] Similarly, it transmitted on an ACDV the fraudulent name Valentinparra on an ACDV long after it was informed that it was a fraudulent name. (*id.*) Even though Equifax knew that Mrs. Valentine disputed the name "Parra," Equifax did not remove it as a "former name as requested." [Fluellen, pgs. 33-34]

**Equifax Failed to Follow Its "One-Fraud, All-Fraud" Policy**

In the January 2005 FCRA trial of Matthew Kirkpatrick, Equifax's Alicia Fluellen testified that,

> [W]e have a verified victim policy, meaning if one of the credit grantors come back and verify that the consumer is indeed a victim of fraud, then regardless of what all the other credit grantors say, we will remove all disputed accounts from the credit file.

Equifax reaffirmed that policy in its testimony in this case. [Fluellen, pg. 66]   However, Mrs. Valentine had several tradelines that were suppressed as fraudulent, but Equifax failed to suppress/delete other fraudulent tradelines that were subsequently and repeatedly disputed by Mrs. Valentine.  Equifax also failed to adhere to its "One-Fraud, All-Fraud" Policy in the cases of other victims of chronic inaccuracy, including those of Matthew Kirkpatrick and Virginia Sloane.

**Equifax & The 'ACDV Exchange'**

Equifax relies on the CDV exchange as its principal means of reinvestigating a consumer's dispute. As Equifax is well aware, I have been critical that it relies on the CDV exchange for disputes that require careful consideration, analysis or true investigation in order to be resolved satisfactorily.  Such types of disputes include but are not limited to, mixed files and identity theft.

The CDV exchange is inadequate for many disputes in these categories because it essentially consists of an exchange of messages known as "Consumer Dispute Verifications" (CDVs).  When the consumer sends his dispute to the CRA, the CRA populates the CDV form with his identifying information (name, address, city-state-zip, SSN, sometimes previous address),[1] and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not mine" or "fraud").  In a "not mine," as well as other types of disputes, the CDV instructs the furnisher to provide "complete ID."

Upon receipt of the CDV form, the furnisher will advise the CRA if a sufficient number of identifiers (i.e., name, Social Security number) match up and then "instruct" the CRA to either delete, modify, or "verify" the information that remains.

Thus, this process is better described as a ***comparison*** of each entity's existing data on the consumer, rather than an independent evaluation or investigation of the consumer's dispute.

As this case illustrates, there can be several problems with the CDV-exchange serving as the principal means of responding to consumer disputes. First, a cursory exchange of messages does not amount to an investigation under any normal sense of the word.  The Webster's New Collegiate Dictionary defines "investigate" as, "v.  To observe or study by close examination and

---

[1] The CRAs often refer to identifiers as "indicative data"

systematic inquiry. Systematic—adj.  Marked by thoroughness and regularity."  An exchange of messages is neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

Second, in cases like this, where the misuse of the victim's identifying information *is the cause* of the inaccuracy in the victim's credit report, and likely will cause future inaccuracies because of the recurring nature of identity theft, the CDV-exchange is not reasonably calculated to prevent predictable, future inaccuracies.

Third, the CDV-exchange is vulnerable to mistakes.  For instance, Equifax will populate the CDV it sent to the furnisher with incomplete information, or actually populated it with information it knows to be inaccurate after receiving the consumer's dispute.  In this case, Equifax transmitted the fraudulent "Spotted Horse" address and the fraudulent name Valentinparra on an ACDV it sent to a collector, long after it was informed that these were fraudulent names and addresses. [Fluellen, pgs. 87-88]  In other instances, the furnisher actually had discrepancies in its identifying information and so notified Equifax, but Equifax chose to consider the false information as "verified."  In other instances, despite the discrepancies, the furnisher instructed Equifax to verify false information, and Equifax complied.  For example in this case, Equifax used the wrong "dispute code" – i.e., "inaccurate information" or "account status" instead of "fraud."  That meant that the Social Security Number (SSN) could become one of the two identifiers needed to "verify" that an account belonged to Mrs. Valentine and should remain on her report.  In this case, Equifax also sent to the furnisher of a fraud account an ACDV with the fraud address (Spotted Horse), which served as the "second identifier" that Equifax needed to "verify" that the RMA fraud collection should remain on Mrs. Valentine's report. (Fluellen, pg. 60)  In the cases I have seen where the system failed to correct inaccuracies, it has been because there appeared to be a clear bias in favor of "verifying" disputed data, in my opinion.

Fourth, because Equifax in this case relied principally on the CDV-Exchange, it did not consider taking other reasonable investigative steps that could have been more effective for dealing with Mrs. Valentine's fraud-related disputes. For example, in her disputes, plaintiff provided contact information to Equifax.  But Equifax did not use the contact information to resolve the problem effectively. Equifax has testified that it is, at best, very uncommon for one of their dispute operators to directly contact a disputing consumer.  Even Equifax's ACDV asks the creditor to include the name and contact information of the employee processing the ACDV, Equifax did not contact any of these processors – even when their response was completely at odds with Mrs. Valentine's dispute, and Equifax knew that other of Mrs. Valentine's disputes were valid. In fact, I am not familiar with an instance in which Equifax called a consumer or a creditor to resolve highly damaging, disputed data. Moreover, from the evidence I have seen, CRAs also do not use other investigatory tools, like look-up services, to verify addresses.

Fifth, Equifax dispute handling processes are biased in favor of the word of creditors over the word of consumers, which in my opinion, reflects disregard for the FCRA's goals of fairness and impartiality.  There are times when the creditor is right and the consumer is wrong.  However, there are times when the consumer is correct in pointing out that errors exist on her credit report and the credit grantor is incorrect in "verifying" errors.  It is Equifax's responsibility

to analyze all available data -- that from the consumer, from the creditor, and that which is in its own files – and then decide which disputed data should remain and which should be removed from the consumer's report.  Or, if there is uncertainty, contact creditors or the consumers directly.

### Equifax Did Not Provide Furnishers With Important Data About Plaintiff's Disputes

Consistent with its policy and practice, Equifax did not provide furnishers with important data relating to Mrs. Valentine's dispute.  For example, Equifax procedures do not require it to send to furnishers the documentation that consumers attach to their disputes. In some of her disputes, Mrs. Valentine attached important documents, including a police report, and copies of her Social Security card, driver's license, and passport – all of which contained her signature. Even though a furnisher could compare the signature of a victim like Mrs. Valentine, with the signature it had on file of a fraudster committing identity theft in her name, Equifax testified that it "did not know" whether Mrs. Valentine's signature was relevant to the furnisher investigating her dispute or whether the furnisher could in fact compare signatures. [Fluellen, pgs. 68, 117-118]

This information was relevant in showing the genuine nature of Mrs. Valentine's dispute, and her strong desire to get it resolved. Equifax should have provided this important information to furnishers to assist their investigations of Mrs. Valentine's disputes, particularly given the fact that Equifax declined to adequately evaluate this information on its own, in my opinion.

### Equifax Was Advised of Shortcomings in the CDV-Exchange Process

I previously advised the three CRAs of the shortcomings in the CDV-exchange process. In December 2003, I sent Experian, Equifax and Trans Union letters detailing the problems I saw with the process from a standpoint of removing inaccurate data disputed by consumers and achieving accuracy.  (One letter concerned Capital One; the other, MBNA.)

### Resource Allocation

Equifax prefers to confine its dispute handling as much as possible to the automated system of CDV-exchange because it lowers costs by reducing the amount of employee time and effort required to handle consumer disputes. CRAs and furnishers view consumer dispute handling as a "cost center," i.e., the priority is to reduce costs.

### Requiring Two Identifiers to Match, Not Including SSN, to "Verify" Disputed Fraud Data

Equifax has a policy of requiring two identifiers to match, not including the SSN, before it will "verify" tradelines that are disputed as fraud.   But Equifax failed to adhere to that policy in this case [Fluellen, pgs 88-90].  Equifax also failed to adhere to that policy in other cases involving both fraud and chronic inaccuracy, including those of Virginia Sloane and Matthew Kirkpatrick.

## Multiple Files & Suppression/Blocking Procedure

When faced with disputes from a fraud victim of chronically inaccurate data, Equifax's practice/procedure is to "suppress" the fraudulent data one tradeline or identifier at a time. However, in several cases, including those of Matthew Kirkpatrick, Virginia Sloane and Nicole Robinson, that practice/procedure never succeeded in assuring accuracy, and in fact, resulted in greater inaccuracy. In those cases, it actually was the mistakes by Equifax employees or agents that caused the fraudulent identifiers to be associated (or re-associated) with the victims, thereby worsening problems of inaccuracy.

One reason for this is that Equifax's one-at-a-time suppression/blocking procedure is prone to error. This is not difficult to understand when one considers that the personnel or agents implementing the procedure are low-paid and are expected to work at a fast pace and process a high volume of disputes. Moreover, as will be discussed in the section below, the procedure is comparable to putting a band-aid on every new little skin rash, rather than addressing more systematically the cause of the rash.

Another reason why Equifax's one-at-a-time suppression/blocking procedure is inadequate in a case like Mrs. Valentine's is because identity theft can create "multiple files" that are associated with the victim. This is due at least in part to discrepancies in Mrs. Valentine's true identifiers and the identifiers, including name, address, "former" name, "former" address and SSN (see below) used by the fraudster. Thus, Equifax's suppression/blocking might stop an inaccuracy from inserting or re-inserting into the victim's "A" file, it might not successfully block it from inserting or re-inserting into the victim's "B" or "C" file. However, when a creditor (subscriber) purchases a consumer's credit report from Equifax, it is not uncommon for Equifax to sell all of the information associated with that consumer throughout the multiple files.

## Partial Matching, Even After Notice of Inaccuracy/Identity Theft

The more systematic problem for victims of identity theft is that Equifax continues using essentially the same "partial matching" algorithms to "build" consumers' files and to decide what information to sell to creditors – even after consumers notify Equifax they are victims of identity theft. This is troublesome because identity theft is typically a recurring and lingering crime that causes recurring and lingering inaccuracy problems to the credit reports of victims.

Accordingly, it is important that the trier of fact understand how CRAs use partial matching of a consumer's identifying data, both to "build" a consumer's credit file and to "return" one to a credit grantor[2] when the consumer (or someone purporting to the be the consumer) applies for credit.

The following description of Equifax's matching algorithm is taken from page of the Second Edition of my book, "Credit Scores and Credit Reports" (cited above).
*(Continued on next page.)*

---

[2] The CRAs refer to purchasers of their credit reports as "subscribers" or "customers"

**The Search Logic/Algorithm**

In the Matthew Kirkpatrick trial cited in the previous chapter, Equifax Vice President Phyllis Dorman said that when "building a file" after receiving data from a creditor, or when deciding what data to include on a credit report that will be disclosed to the creditor, the first factor considered by the Equifax system was geographic region.

Then its "matching algorithm," known as L90, relies on 13 matching elements. Two of the elements that constitute a distinct category are: (1) exact Social Security number (SSN) and (2) partial SSN (meaning that most, but not all digits are the same).[3]

The remaining elements are (3) last name, (4) first name, (5) middle name, (6) suffix, (7) age, (8) gender, (9) street number, (10) street name, [4] (11) apartment number, (12) City, state and zip, and (13) trade account number …

… Since the subscriber is buying the credit report in order to decide whether or not to grant you credit, the CRA wants to ensure that it does not leave out anything that *could* be relevant to that decision.  After all, if the CRA failed to include evidence of late payments in your credit report, and you default, the credit grantor is going to blame the CRA. Another factor is the credit grantor might only have limited information about the consumer, like name and address, and no SSN, or its employee might have written down the SSN incorrectly.  Therefore, the ***CRA seeks to maximize disclosure of any possible information that might relate to the consumer*** about whom a subscriber inquires … [Emphasis added]

… To accomplish this, the CRAs' algorithms are designed to accommodate such errors as transposed digits within SSNs, misspellings, nick names, and changed last names (women who marry), and different addresses (people who move), by accepting "partial matches" of SSNs and first names, and in some circumstances, assigning less importance to last names.

Thus, while you must provide an exact match of your SSN to obtain your own credit report, a subscriber can still obtain your credit report even if there is a match of only seven of the nine digits in your SSN. What's more: if the SSN on the credit application exactly matches yours, the CRAs' algorithms often will tolerate major discrepancies in last name, street address, city, and state …

---

[3] Testimony of Phyllis Dorman, <u>Matthew Kirkpatrick v. Equifax Credit Information Services</u>, U.S. Dist. Ct., Oregon, CV-02-1197-MO; 1/20/05

[4] Some algorithms may only use the first 4-to-6 characters of the number-address field, which would mean that "123 Main Street" would match "123 Mainwright Street."

> …In important ways, the CRAs algorithms have helped identity thieves.  In "true-name fraud," the key moment occurs when the CRA discloses the innocent victim's credit report to a subscriber holding the identity thief's application for credit.  This disclosure enables the fraudster to obtain credit in the name of the innocent victim.
>
> Identity thieves often enter mistaken data when they fraudulently apply for credit. But if they have obtained the victim's SSN, it will help override other discrepancies in the application and convince the CRA algorithm to disclose the victim's credit report.  Even if there are mistakes in the SSN, the "partial match" tolerance within the algorithm still gives the fraudster a chance of triggering release of the credit report …

Thus, under Equifax's system, the exact match of the SSN, meaning a 9-for-9 digit match, can permit its system to disregard important discrepancies in name, address or date-of-birth.  Equifax generally argues that this is necessary because of women who marry and change their names and people who move.

However, in the case of "True Name" identity theft, it is the misuse of the exact SSN that is enabling the identity theft and causing fraudulent accounts to be placed upon the credit report of the innocent victim, unfairly damaging that victim's credit worthiness and ushering in the nightmare of repairing a polluted credit report.  Thus, in my opinion, it is essential that after a consumer notifies a CRA like Equifax that she is a victim of identity theft, that the CRA adjust towards more precise matching and not disregard important discrepancies in name, address or date-of-birth.  CRAs need to make a qualitative assessment of the environment in which they operate.  Because identity theft is a long-standing and prevalent phenomenon that systematically threatens credit report inaccuracy, the CRAs need to recognize this and adjust their practices and procedures accordingly, in my opinion.  One way to actually ensure that a reinvestigation adequately resolves an identity theft or mixed file dispute is to assign an experienced "case officer" to actually *critically* review the result of a consumer's dispute.

In the case of Mrs. Valentine and other victims of credit report inaccuracy caused by Mixed Files or identity theft, one of Equifax's most critical shortcomings was that it did not adjust towards more precise matching criteria after it knew or should have known that partial matching was contributing to the inaccuracies.[5]  In other words, Equifax knew that identity theft was often an ongoing and recurring phenomenon.  This meant that the imposter was likely to continue to generate unpaid debts, which creditors were likely to continue reporting to Equifax.  Equifax should have moved toward a more precise matching approach to ensure that accounts associated with "Rebeca Valentin" or "Valentinparra" or the "Spotted Horse" address were blocked from mixing into Mrs. Valentine's credit file.  At a minimum, after Mrs. Valentine's

---

[5] Equifax sometimes cites a 2004 preliminary study by the FTC to supports its use of partial matching, but the FTC only examined partial matching from a general perspective and did not address the important issue in this case and the one about which I am expressing an opinion here: Whether adjustments towards a more precise match should be made after the CRA knows that partial matching is causing errors in a particular consumer's report.

repeated disputes, Equifax should have assigned an experienced employee to her file, which it did not.

However, Equifax did not do this.  Moreover, it never considered doing it, in part because of its unreasonable reliance on its one-at-a-time suppression/blocking procedure – despite knowing that this very procedure had failed in cases similar to Mrs. Valentine's.

**Fraud Alerts Were Inadequate To Prevent Foreseeable Damage to Mrs. Valentine**

The "Fraud Alert" is Equifax's principle response to a consumer who informs them that she is a victim of identity theft or fraud.  It is important that the trier of fact understand what a Fraud Alert is designed to accomplish, and what it is not designed to accomplish.

At the time period relevant to this case, the first part of the Fraud Alert is essentially two words – "Fraud Victim" – that are added as text to the credit report's "Alert" section.  The second part is a "consumer statement" in which the victim often states that "fraudulent applications might be made using my information" and to carefully check personal data and/or call the victim at a specified phone number(s) before granting credit.  The Fraud Alert is designed to make creditors aware that the consumer might have been a victim of fraud, hopefully prompting creditors to take additional precautions before granting credit.

If creditors carefully read and consider the text of Fraud Alerts, then the Fraud Alerts can help ensure that credit is not extended to identity thieves.  However, the first problem is that some creditors do not carefully read and consider the text of fraud alerts.  The 2003 Congressional FACT Act hearings confirmed years of anecdotes preceding them: it was not uncommon for credit grantors to grant credit to identity thieves, despite the presence of Fraud Alerts.  As Linda Foley, Executive Director of the Identity Theft Resource Center (ITRC), testified before Congress in June 2003, "Fraud alerts only help a little. Most places do not even honor them. So I'm not sure they help very much … After I put the fraud alert on, they still opened a few more credit cards. All of the accounts they opened were done on the Internet."[6]

Moreover, many credit decisions are automated – made "computer-to-computer" – with little or no human intervention, thereby greatly reducing chances that the creditor will heed a Fraud Alert.

Here are some important steps by Equifax that Fraud Alerts generally *do not* facilitate and *did not* facilitate in Mrs. Valentine's case:

- Prevent sale of the credit report to the credit grantor who provides an application with identifiers tied to the imposter.

- Prompt an investigation to discover the source or sources of the identity theft, so appropriate steps can be taken to prevent future.

---

[6] Written Testimony of the Identity Theft Resource Center (ITRC): Linda Foley, Executive Director, before U.S. Senate Banking and Finance Committee Hearing, "Identity Theft – Victimization and Crime," June 19, 2003

wrongful disclosures and/or wrongful access to the victim's credit report, or to identify damage to the victim and mitigate those damages.

- Prompt an adjustment towards more precise matching to ensure that the foreseeable additions of fraudulent accounts are prevented.

- A halt to the imposter's continued use of accounts fraudulently opened in Mrs. Valentine's name.

### Maintenance Reviewer As 'Ensurer' of Accuracy

Under its system, Equifax's investigations rely on the "maintenance reviewer" to review an "investigation" of a consumer's dispute and ensure that the outcome is correct. However, in other cases, including those of Matthew Kirkpatrick, Virginia Sloane and Nicole Robinson (pending), chronic inaccuracy persisted because maintenance reviewers consistently failed to catch obvious errors and prevent them from being included in the files of disputing consumers. In some instances, the actions of the maintenance reviewers worsened inaccuracy.

The same is true in Mrs. Valentine's case. (Fluellen, pgs. 83, 89 & 103.) Moreover, I'm still waiting to see an instance in which the maintenance reviewer caught an error and prevented an inaccuracy in Mrs. Valentine's file. I do not recall a maintenance reviewer accomplishing this in the other cases either. Thus, even though Equifax sets up maintenance reviewers to ensure accuracy, they cannot be relied upon to do so – at least in part because of the emphasis on volume and obeying the instructions of furnishers.

### Equifax Doesn't Know Why Its Policies Were Not Followed

In Mrs. Valentine's case, there were several instances in which inaccuracies were not corrected because Equifax's personnel or agents missed obvious errors or failed to follow Equifax procedures. Yet, Equifax testified that it did not know why this happened. [Fluellen, pgs. 99-100 & 103] To ensure accuracy, Equifax must have sufficient control over and knowledge of its operations. But considering that Equifax testified in previous cases that it did not know why employees or agents missed obvious errors or failed to follow Equifax procedures, it is apparent that Equifax lacks sufficient control over and knowledge of its operations in cases of chronic inaccuracy.

Moreover, Equifax did not know why its personnel or agents told Mrs. Valentine it was deleting certain disputed accounts, and then apparently failed to delete them.

### Equifax, Reinsertion & Multiple Files

When it comes to reinsertion, Equifax views consumer data in an overly "compartmentalized" way. That is to say, if it maintains multiple files on a consumer, then Equifax only believes that it need prevent reinsertion of previously deleted data to one of the consumer's files, usually the "A" file.   [See deposition excerpt, next page.]

11

**Q**. … Did Equifax reinsert previously deleted information into Ms. Valentine's credit file?

**A**. No. It appears as though, when I looked at that scan, that account appeared to be on another file with a file-since date of March 1, 2002."

**Q.** So the account has migrated to a separate and distinct credit file, correct?

**A.** Yes.

**Q.** But it was still a credit file that was associated with Ms. Valentine, right?

**A.** Yes.

**Q.** So your testimony is that Equifax did not reinsert previously deleted information into Ms. Valentine's credit file?

**A.** Yes, from what I could tell. [Fluellen, pgs. 71-72]

However, one problem is that when a creditor (subscriber) purchases a consumer's credit report from Equifax, it is not uncommon for Equifax to sell all of the information associated with that consumer throughout the multiple files.  Moreover, the consumer is not overly concerned about which internal file her information comes from.  In an identity theft situation, the consumer's main concern is that no inaccurate, fraudulently generated information is included in a file about her that is sold to a creditor.  But that is precisely what Equifax's approach permits, and it was precisely what happened to Mrs. Valentine.  It is also what happened to Virginia Sloane.  In that case, Equifax also took the position that the migration of deleted data from one consumer's multiple file to a different multiple file of the same consumer did not constitute "reinsertion."

### Online Combine Reports & Frozen Data Scans

Equifax fails to utilize important internal documents, like online combine reports and frozen data scans, in resolving complex and long-running consumer disputes, even though these very same documents are regularly used in this case and other litigation to discover what went wrong.

### Preventing Duplicate Collections Accounts After ID Theft

Despite the fact that identity theft can generate duplicate collection accounts for the same debt that have similar account information , neither Equifax's investigations department [Fluellen, pgs. 81-82], nor its computer systems department [Annette Simpson, pg. 26] has a procedure to identify duplicate collection accounts and remove them from a consumer's report or prevent them from coming on in the first place.

### Pattern-Recognition Software

When identity theft strikes, it often results in a surge in delinquent accounts in the file that otherwise had a good credit history.  However, neither Equifax's investigations department nor its computer systems department [Simpson, pgs. 28-29] utilizes pattern-recognition software or has alternative procedures to identify relatively sudden changes in a consumer's credit history.

### Contradictory View of Identity Theft

Equifax has a somewhat contradictory view of identity theft.  On the one hand, for the past several years, the cover page to Equifax's reports that are disclosed to consumers seek to promote its credit monitoring services, and feature a box stating:

> **The FBI Has Named Identity Theft As The Fastest Growing Crime In America**   Protect yourself with  Equifax Credit Watch$^{TM}$, a service that monitors your credit file every business day and notifies you within 24 hours of any activity.  To order, go to: www.creditwatch.equifax.com

On the other hand, in response to the question, "Would you agree that identity fraud is a significant problem in credit reporting and maintaining your database?" Equifax testified, "I'm not aware of any specific issues of it being that major."

This testimony appears to reflect that apart from using identity theft to promote one of its products, Equifax's true view that it is not concerned about the threat to accuracy that identity theft poses.  The following exchange was telling:

> Q.     Does your department at Equifax take any steps or procedures to prevent identity theft? …  What I'm asking you is in your department do you do anything to prevent fraudulent accounts from being included in a consumer's credit file?
>
> A.     Credit grantors have the ability to report to us that the account is an identity theft, and if that is the case, then we suppress that data out of the consumer's file, but other than that, I – I guess I don't understand what you're asking me.
>
> Q.     Well, I think you're answering my question and I appreciate it.  [Simpson, pg. 29]

Thus, despite its knowledge that identity theft is a long-standing and prevalent phenomenon that can threaten credit report accuracy, Equifax makes no system-wide effort to identify signs of identity theft or prevent fraudulent data from entering a consumer's file.

### Absent Lawsuit, Errors Would Have Persisted

Under Equifax's system, inaccuracies in Mrs. Valentine's Equifax credit report would have persisted, in my opinion.   As was the case with other victims of chronic inaccuracy caused by mixed files or identity theft, it was only by filing a federal lawsuit that she was able to effectuate substantial correction of her credit report.  This is because the lawsuit prompted a reinvestigation directed by an experienced human being that comported more closely with the definition of "investigation," as opposed to Equifax's standard CDV-exchange. As with the cases of other victims, the "human-directed" reinvestigation inspired by Mrs. Valentine's lawsuit was superior to the CDV exchange because it entailed, for the first time, (1) careful consideration of, and reflection on, the cause of the inaccuracy, (2) a concern for the underlying truth, (3) the taking of necessary investigative steps to determine the underlying truth, and (4) the goal of ensuring that the underlying truth was reflected in Mrs. Valentine's credit report.

### Equifax Disregards Need For Changes To Address Identity Theft-Related Inaccuracy

The consistent pattern of Equifax's failures between past cases and Mrs. Valentine's, coupled with the results of previous cases, and, with Equifax's position in this case, confirms that Equifax does not plan to make changes that would effectively address the types of chronic inaccuracy problems that plagued Mrs. Valentine and other consumers in previous cases, and which were identified by the Federal Trade Commission and the State Attorneys General in the early 1990s.

Equifax's corporate representative, Ms. Fluellen, testified in the Matthew Kirkpatrick trial, and sat through the Virginia Sloane trial. In both these cases, the plaintiffs were victims of chronic inaccuracy and Equifax was unable to begin to ensure the accuracy of their credit reports until they filed lawsuits. In both cases, Equifax took the position that it had it not violated the FCRA. Even though the jury adamantly disagreed in both cases, Equifax continues to testify that it did not violate the FCRA, and shows no indication that it will cure the shortcomings that have contributed to inaccuracy in all of these cases and likely will contribute to inaccuracy in future cases.

### Potential Areas of Testimony: Damages Known & Common To Victims of Chronic Credit Report Inaccuracy/Identity Theft

It is important that the trier of fact understands that victims of chronic credit report inaccuracy or identity theft often experience a series of several known and common types of negative impacts.

### Some Categories of Typical Negative Impacts of ID Theft & Chronic Inaccuracy

(1) Inaccurately described as not creditworthy and/or less creditworthy to third parties
(2) Improperly denied credit because of inaccurate data, or only able to obtain credit at less favorable rates
(3) Expended time and energy to correct errors not of one's making; in addition to loss of time and energy, loss of opportunity
(4) Wrongfully received debt collection calls
(5) Chilled from applying for credit
(6) Sleeplessness, physical symptoms
(7) Sense of helplessness, loss of control over personal data
(8) The emotional distress stemming from, and associated, with all of the above

The following factors could be used to gauge the severity of damage within each category.

### Key Factors To Consider When Assessing Severity of Negative Impact

The nature and substance of the category of damage
Time & energy to solve the immediate problem
The expectation that the problem was solved
The number of recurrences
The period of time over which the problem persist

## Mrs. Valentine's Damages Were Consistent with Other Victims
## of Credit Report Inaccuracy

The testimony of Mrs. Valentine strongly suggested that her damages were consistent with other victims of chronic credit report inaccuracy.  Her experience touched on most if not all of the eight categories cited above.  In addition to the categories above, it is important for the trier of fact to understand that it can be very distressful not knowing everyone who may have associated you with highly derogatory credit data. Moreover, in my opinion, it can be difficult to maintain constructive personal relationships under stress.[7] It can be difficult to perform adequately at one's job.

## Defendant Knew or Should Have Known It Actions Would Have Negative Impact

The history of credit reporting cited above, which includes years of Congressional testimony and legislative actions, Federal and State enforcement actions, abundant media coverage and targeted books, such as mine, made it abundantly clear to Equifax that failing to prevent Mrs. Valentine from becoming a victim of chronic inaccuracy would have a highly negative impact on her.  The Defendants also should have known this because she specifically informed them more than once in her dispute letters.

## Potential Areas of Testimony: General Issues, Context

**Table of Contents**

    **A.**    **The Nature and Purpose of Credit Scores**
    **B.**    **The Nature and Purpose of Credit Reports**
    **C.**    **History of Significant Rates of Inaccuracy In Credit Report Data**
    **D.**    **History: Increased Attention on Role of Furnisher**
    **E.**    **Identity Theft: Long-Standing, Prevalent & Threat To Accuracy**

## Nature & Purpose of Credit Scores

It is possible that the trier of fact is not intimately familiar with either the credit reporting or credit scoring systems.  If this is the case, I can provide expert testimony on the nature of both systems, how to read and understand credit reports and how to dispute errors, the parameters of credit scoring, the general impact that derogatory data have on a credit score, the interplay between identify theft, credit scoring and credit reporting, and other related matters.

A credit score is a number that reflects a consumer's creditworthiness at a given point in time.  The FICO model credit score, which is used by 75 percent of lenders, is based entirely on information in a consumer's credit report. The model was developed by Fair, Isaac & Co., which licenses it to Equifax, Experian and Trans Union and others.  The scoring range for the FICO "classic" model is 300-850.  The various types of "Beacon" scores sold by Equifax, and "Classic

---

[7] In fact, the insurance industry says that stress, stemming from financial problems, can cause auto accidents, and therefore justifying its use of credit reports in setting insurance rates.

FICOs" sold by Trans Union,[8] are based upon the FICO model. The higher the credit score, the less risky the consumer is viewed by creditors. Consequently, consumers with higher-end credit scores (720 and above) often can obtain the most favorable rates for mortgages, refinancing, personal and auto loans and auto and homeowners insurance, and also often receive solicitations for the best quality credit cards. Conversely, the lower the score, the less favorable the rate. A credit score of 620 and below is widely regarded as "sub-prime."

Maintaining a good credit score is important because of a fundamental rule: the lower one's score, the more one pays for credit, including higher interest on mortgages, auto loans, installment loans and credit cards.

For example, the Web site of Fair Isaac Corp., www.myfico.com,[9] gives this example of the difference that credit scores make in terms of interest and monthly payments, on a $300,000 30-year, fixed-rate mortgage:

| Your FICO® Score | Your Interest Rate | Your Monthly Payment |
|---|---|---|
| 760 - 850 | 6.148% | $1,827 |
| 700 - 759 | 6.370% | $1,871 |
| 680 - 699 | 6.654% | $1,927 |
| 660 - 679 | 7.464% | $2,090 |
| 640 - 659 | 8.816% | $2,374 |
| 620 - 639 | 9.782% | $2,584 |

A similar chart exists for auto loans. Moreover, about half of the major credit card companies practice "Universal Default," meaning that these companies will raise their cardholders' interest rates if those cardholders' credit scores drop below certain levels – even if the cardholder never had a late payment with the company.[10]

1.    The precise workings of the FICO score are highly proprietary and therefore closely guarded. However, the general parameters are publicly available:[11]

**35% -- Payment history.** Late payments, particularly major or serious derogatories, like 90-days late or worse, and particularly on important accounts like mortgages, are very damaging to one's credit score.

**30% -- Credit Utilization.** The ratio between available "revolving" credit and how much is actually used (credit card balances vs. credit card limits).

---

[8] Until recently, the Trans Union FICO Score was called "Empirica"
[9] Visited September 21, 2005
[10] Universal default is described in detail in Chapter 22 of the 2nd Edition of "Credit Scores and Credit Reports," op. cit.
[11] *These parameters are published in Chpr 1 of both Editions of "Credit Scores and Credit Reports," op. cit.*

**15% -- Length of Credit History.**  The longer you maintain a positive credit history, the better it is for your credit score.

**10% -- How Much New Credit?.**  This relates to "inquiries" that creditors make when you apply for credit.

**5% -- Healthy Mix of Credit?**  The scoring model prefers to see a "healthy mix" of mortgage, credit cards and perhaps other kinds of credit.

2.    It is important to understand that consumers are most severely penalized when they have a serious derogatory within the past eleven months.  The "importance of being recent" is illustrated by the following Fair Isaac chart, which shows, in a proportional sense, that a major delinquency in the past year has a 93% negative impact, while a major delinquency between 1-2 years-old has about a 60% negative impact; a major delinquency between 2-3 years-old has a 44% negative impact; a 3-4 year old delinquency has a 33% impact; any delinquency older than 4 years has only a 22% negative impact.



There is growing public awareness about credit scoring, but it is by no means complete. A September 2004 survey by Opinion Research Corporation Intl. sponsored by the Consumer Federation of America (CFA) and Providian Financial, a major credit card issuer, found that:

> Few consumers know what constitutes a good score. Only 12% correctly identified the low 600s as the level below which they would be denied credit or have to pay a higher, sub-prime rate. (One-third thought this level was the low 500s, and 30% said they didn't know.) And, only 13% correctly understand that scores above the low 700s usually qualify them for the lowest rates. http://www.consumerfed.org/092104creditscores.PDF

17

A March 2005 General Accounting Office study found that about one-third of respondents had obtained their credit scores.  While 70 percent of respondents correctly identified the definition of a credit score and understood many of the factors that could impact credit scores, only 28 percent could provide a number within a range of possible credit scores. In addition, consumers were more familiar with some of the factors that affected credit scores than with others. For example, while most consumers knew that skipping loan payments or making late credit card payments had a negative effect on credit scores, about half did not know that using all the credit available to them, such as reaching the maximum limit on a credit card or home equity loan, had a negative effect. Also, when asked about information that had no effect on credit scores (such as a low checking account balance), about half of consumers answered the questions incorrectly or said that they did not know, the GAO found.[12]

### Nature & Purpose Of Credit Reports

Similar to credit scoring, there is growing public awareness about the credit reporting system, but it is not universal.

According to a July 2003 survey by the Consumer Federation of America, "Only 25 percent of Americans – and less than 20 percent of those with incomes below $35,000 – said they knew what their credit score was. But only three percent of Americans could, unprompted, name the three main credit bureaus-Experian, Equifax, and Trans Union-that provide both lenders and consumers with information from credit reports.  Forty-three percent of Americans (35 percent of those with incomes below $35,000) said they had obtained a copy of their credit report from the three credit bureaus in the past two years."

A March 2005 General Accounting office report concluded that the public's understanding of credit reports and credit scores was improving, but that a federal education campaign was needed to better inform those segments of the population that remain unfamiliar with the systems.  The report found that 60 percent of respondents had seen their credit reports, most often because they were making a large purchase or refinancing a loan. Most of these consumers said that they understood their reports.  However, about half (53 percent) did not know that information could stay on their report for 7 or 10 years.[13]

It is important that the trier of fact have an accurate understanding of the nature and purpose of credit reports.  Accordingly, a brief description of the consumer report is fundamental to my opinions in this case.

A consumer report, sometimes referred to as a credit report, consists of highly sensitive and personal information, containing a compilation of a consumer's current credit relationships, their credit history, their employment history, estimated income and identifying information, such as name, address, phone number and Social Security Number (SSN).  There are three major repositories known as credit bureaus or consumer reporting agencies (CRAs) -- Equifax, Trans

---

[12] General Accounting Office, "Credit Reporting Literacy: Consumers Understood the Basics but Could Benefit from Targeted Educational Efforts" (GAO-05-223). www.gao.gov/new.items/d05223.pdf
[13] *Ibid.*

Union and Experian.  The CRAs regularly receive updates on a consumer's credit relationships from credit grantors -- banks, mortgage companies, credit card issuers, department stores and others.  The consumer report typically contains highly sensitive details about a consumer's finances, including account numbers, loan amounts, credit limits and payment history.  It also can contain information on the consumer's interaction with the judicial system, including paid or unpaid civil judgments or bankruptcies.

The Credit Report consists of three (or four) basic sections:

(1)    A section with the consumer's *identifying information*-name, address, Social Security number, date of birth, previous address, employer, and sometimes phone number.

(2)    A section with the consumer's *payment history*, including mortgage, auto and installment loans, credit cards and department store cards, collections, and public records like bankruptcy and court judgments.

(3)    If applicable, a section showing *public record* information, like bankruptcies, court judgments and tax liens.

(4)    A section showing *inquiries*, in other words, those companies which accessed the report and for what purposes.

In addition, attached to the credit report is

(1) A form for disputing errors, and
(2) A statement of your rights under the FCRA

Each of the Big Three CRAs uses a slightly different format.  A fundamental purpose of the credit report is to describe a consumer's creditworthiness.  For example, the Equifax report lists the codes showing how consumers are classified when they don't pay their bills on time. Along with these numeric codes, a credit report can have a letter showing the type of credit, i.e., "R" for revolving (credit card) and "I" for installment (personal loan).  The code for someone who always paid her credit card on time would be "R1."  Here are the numeric codes:

- 2 : 30-59 Days Past Due
- 3 : 60-89 Days Past Due
- 4 : 90-119 Days Past Due
- 5 : Over 120 Days Past Due
- 7 : Included in Wage Earner Plan
- 8 : Repossession
- 9 : Charge Off
- Blank : No Data available for that month
- 0 : Too new to rate, or unrated
- 1 :  On Time

The Trans Union and Experian credit reports describe similar categories with a text narrative, rather than with an alpha-numeric code.

It is important to note that public record information like bankruptcy, judgments and tax liens, and charge-offs (R-9) and collections, are considered some of the most negative entries. It is also important to note that when a creditor reports a negative tradeline as disputed, that tradeline typically is not scored and therefore does not negatively impact the credit score.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit, whether it is a loan or a credit card. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers use credit reports for underwriting purposes, and also use credit scores, but presumably only where not prohibited by State law.

Credit grantors typically review a consumer's report and/or credit score when deciding to grant that consumer some form of credit. Credit grantors also review consumer reports and/or credit scores on current customers to periodically check on their customers' creditworthiness. This is known as an "Account Review." Credit card issuers regularly use consumer reports and/or credit scores to screen consumers for "pre-approved" credit offers. Some employers use consumer reports to evaluate job applicants. Insurers also can use credit reports for underwriting purposes. Landlords also use credit reports for tenant screening.

## History of Significant Inaccuracy Problems

It is essential that the trier of fact understand that there is a long-standing problem of significant inaccuracy rates in credit reporting data. Since 1990, several non-industry studies have concluded that credit report inaccuracy is a problem of significant proportions that can have a major negative impact on the victims of inaccuracy, and that can potentially be detrimental to the credit system as well.[14] This history is covered in Chapter 10 of my book, "Credit Scores and

---

[14] Williams, James (CIS), "Credit File Errors, A Report," August 7, 1989 -- The first survey of 1,500 consumer reports and found serious error rate of 42% to 47%;

Consumers Union, "What Are They Saying About Me? The Results of A review of 161 Credit Reports From The Three Major Credit Bureaus, April 29, 1991 -- 48% contained "serious errors," defined as meaning those that could, or did, cause the denial of credit, employment or insurance.

U.S. Public Interest Research Group (US PIRG), "Nightmare On Credit Street (Or How The Credit Bureau Ruined My Life): Case Studies Documenting Consumer Complaints and Recommendation For Amending the FCRA," June 12, 1990

U.S. Public Interest Research Group (US PIRG), "Don't Call; Don't Write; We Don't Care." 1991 -- Review of 156 consumer report complaints on file at the FTC revealed that the average duration of complaints against a CRA was 22.5 weeks, or almost 6 months

U.S. Public Interest Research Group (US PIRG), "Public Enemy #1 At The FTC " October 1993, Based upon a Freedom of Information Act request, the 1993 report found that between 1990-93, problems with credit bureaus was the leading cause of complaints to the FTC (30,901, 20.6%). The 1993 PIRG found that 44% of complaints concerned mixed files, and that among those, 64% involved the mixing of data with total strangers.

Credit Reports."  As that Chapter notes, in the early 1990s, problems with inaccuracy and "mixed files," CRA non-responsiveness and inadequate reinvestigations became the cause of complaints to the FTC.  These and other complaints prompted the FCRA's oversight authorities – the FTC and State Attorneys General – to launch investigations and take enforcement actions. These actions resulted in a series of separate consent decrees involving Equifax, Experian and Trans Union in which each pledged to do a better job of maintaining accuracy, avoiding mixed files and the reappearance of previously deleted data, being more responsive and conducting adequate reinvestigations.

On June 22, 1992, Equifax signed an "Agreement of Assurances" with 18 State Attorneys General (AGs).  In 1994, it signed an "Agreement Containing Consent Order To Cease and Desist" with the FTC.

The first problem identified by the 1992 State AG Agreement was the need to avoid the occurrence or reoccurrence of mixed files.  The Agreement defined "Mixed File" as a ***"Consumer Report in which some or all of the information pertains to a person or persons other than the person who is the subject of the Consumer Report."*** The 1994 FTC Consent Order's definition of Mixed File was identical. The Agreement also emphasized the importance of using "full identifying information," defined as "full last and first name; middle initial; full street address; zip code, year of birth; any generational designation; and social security number."

The 1994 FTC Consent Order also emphasized the prevention of mixed files.  In highlighting the need for adequate reinvestigations, the Order stated that such reinvestigations shall include…:

> … Accepting the Consumer's version of the disputed information and correcting or deleting the disputed information, when the Consumer submits to Equifax documentation obtained from the source of the information in dispute which confirms that the disputed information on the Consumer Report was inaccurate or incomplete …

Moreover, in the 1992 agreement with the State Attorneys General, Trans Union agreed to adhere to the following practices:

---

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: Credit Report Errors Mean Consumers Lose," March 1998

"Credit Reports: How Do Potential Lenders See You?" *ConsumerReports.org,* July 2000.

Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*, December 2002.

Robert Avery, Paul Calem, Glenn Canner, and Raphael Bostic, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, February 2003.

U.S. Public Interest Research Group (US PIRG), "Mistakes Do Happen: A Look at Credit Report Errors," June 2004

    iv.    Upon receipt or documentation from the Consumer which Trans Union determines is reliable and/or authentic and which supports the Consumer's version of the disputes information, correcting or deleting the dispute item…

    v.    As to Consumer disputes concerning Mixed Files, assigning such disputes, for investigation and resolution, to Senior Investigators who are experienced in handling such disputes.  In such cases the Investigator shall, as appropriate: 1) pull all files which may be involved in the dispute; 2) fully verify disputed tradelines to determine whether the tradeline is owned by the Consumer in whose file it resides; 3) make any changes, deletions, or additions to correct the Consumer's file and resolve the dispute; and 4) for files which are found to be mixed, prepare a summary and hard copies of the files involved to the systems support division of the Data Processing Department, for review and analysis by that Department as to the need for corrective action…

### History: Increased Attention on Role of Furnisher

This Consent Agreements are relevant because (1) they created widespread publicity about the problems of credit report inaccuracy, (2) they articulated (an agreed upon) higher and more specific standard of care to ensure accuracy and fairness, and (3) they formed the foundation for the 1996 Amendments to the FCRA.  However, Congress knew that to ensure accuracy, it needed to go beyond the Consent Agreements by placing duties on furnishers to report information accurately.

The April 1994 House Banking Committee Report on the proposed amendments explained why, despite the consent agreements, and subsequent industry guidelines, legislation was necessary: "Moreover, because the industry guidelines are simply voluntary, they are unenforceable and may be changed or revoked at any time.  Many of the provisions in the consent agreements expire after a short period of time, are not enforceable by consumers, and do not apply in every state. ***Additionally, these agreements do not impose any reinvestigation obligations on furnishers of information or on credit bureaus other than the three largest. Because of these limitations, federal legislation is necessary to improve accuracy-related protections for consumers. Consequently, the bill contains new reinvestigation procedures which are intended to cut down on the number of errors in consumer reports and to reduce the delay in correcting those errors.***"  [Emphasis Added]

Importantly, the Consent Agreements' language on preventing reinsertion was incorporated and expanded upon in the 1996 Amendments to the FCRA.  Under Sect. 1681 (a)(5)(B), information cannot be reinserted unless it is "certified" as complete and accurate by the furnisher.  Moreover, a CRA, five business days prior to any reinsertion, must notify the consumer, and also provide the name and address of the furnisher and inform him or her of his right to add a statement.

Despite these Consent Decrees, the problems of mixed files, inadequate reinvestigations and reappearance did not go away.  Throughout the early 1990s, Congress held a series of hearings in which numerous consumers and consumer advocates described problems with inaccuracy, mixed files, CRA non-responsiveness, and inadequate reinvestigations.  This resulted in the 1996 legislative amendments to the FCRA.

I cite this brief history because it makes clear that for well over 10 years, Equifax was on notice from Congress, the FTC, State AGs, and the public that there were serious shortcomings in their routine practices for producing credit reports, reinvestigating, preventing reappearance of previously deleted data and being responsive to consumers complaining about disputes.  Equifax was also on notice that these shortcomings caused damage to consumers.  The expectation of Congress, the FTC, State AGs, and the public was that Equifax would improve their procedures and practices for ensuring accuracy, adequately reinvestigating, preventing reappearance and being more responsive to consumers, in my opinion.

**Identity Theft**

It is essential that the trier of fact understand that another problem that poses a direct threat to the accuracy and integrity of personal data held by CRAs is identity theft.  Identity theft occurs when an imposter steals a consumer's identity, usually through the use of the consumer's Social Security number, to exploit the innocent consumer's credit-worthiness.   Identity theft is a sub-category of the more general category of Mixed Files, as the imposter-generated fraudulent activity is mixed into the consumer report of the innocent victim.

Trans Union statistics found that consumer inquiries about identity theft grew from 35,235 in 1992 to 522,922 in 1997.  Subsequent GAO reports confirmed that identity theft continues to escalate in the United States.   In 1999, Congress passed the Identity Theft Deterrence Act, specifically making it a federal crime to steal someone's identity.

The CRAs know that identity theft is a significant and growing problem that threatens the accuracy and integrity of credit report data.  For instance, for the past several years, the cover page to Equifax's credit reports feature a box stating:

**The FBI Has Named Identity Theft As The Fastest Growing Crime In America**
Protect yourself with  Equifax Credit Watch[TM], a service that monitors your credit file every business day and notifies you within 24 hours of any activity.  To order, go to:
www.creditwatch.equifax.com

A 2003 FTC survey confirmed that identity theft was indeed a serious national problem, estimating in that year there were 9.9 million victims of identity theft, up from an estimated 6.9 million victims in 2002 and 3.4 million victims in 2001.   Identity theft victims reported a wide range of problems, including wrongful bank and credit card charges, harassment by collectors, loan or insurance rejection, cut off of utilities, civil lawsuits, and criminal investigations.

The Identity Theft Resource Center (ITRC) published a survey of identify theft victims in 2003.  In that survey the ITRC commented, "Three-fourths of victims were left with a feeling of

financial insecurity, 88% experienced anger, and 75% expressed a feeling of helplessness… While most surveys have focused on the financial costs to victims, these psychological impacts are generally unreported."

On March 7, 2000, Jodie Bernstein, then head of the FTC's Bureau of Consumer Protection, testified before Senate Judiciary Subcommittee on Technology, Terrorism and Government.  In Ms. Bernstein's July 12, 2000 testimony regarding typical identity theft cases, she pointed out to the subcommittee the exact types of problems which Mrs. Valentine faced in dealing with Equifax.  Ms. Bernstein testified:

> The leading complaints by identity theft victims against the consumer reporting agencies are that they provide inadequate assistance over the phone, or that they will not reinvestigate or correct an inaccurate entry in the consumer's credit report. In one fairly typical case, a consumer reported that two years after initially notifying the consumer reporting agencies of the identity theft, following up with them numerous times by phone, and sending several copies of documents that they requested, the suspect's address and other inaccurate information continues to appear on her credit report. In another case, although the consumer has sent documents requested by the consumer reporting agency three separate times, the consumer reporting agency involved still claims that it has not received the information.

While credit report inaccuracy was the leading cause of complaints to the FTC in the early 1990s, for five years in a row (2001-2005), identity theft has been the leading cause of complaints to the FTC, far outpacing other categories.  For instance, here was the FTC's Top 10 Consumer Fraud Complaints list on January 23, 2002:

1)   *Identity Theft* (42%);
2)   Internet Auctions (10%)
3)   Internet Services and Computer Complaints (7%)
4)   Shop-at-Home and Catalog Offers (6%)
5)   Advance Fee Loans and Credit Protection (5%)
6)   Prizes/Sweepstakes/Gifts (4%)
7)   Business Opps. and Work at Home Plans (4%)
8)   Foreign Money Offers (4%)
9)   Magazines and Buyers Clubs (3%)
10)  Telephone Pay-Per-Call/Info Services (2%)

As mentioned, the percentage of FTC complaints over identity theft have remained consistent to this day.

Improving consumers' ability to ensure the accuracy of their credit reports was a top priority of Congress in 2003, when it devoted the entire year to reviewing and strengthening the FCRA with enactment of the FACT Act (Fair And Accurate Credit Transactions Act).  Relevant to this case was the clear message from virtually all parties that identity theft posed a direct

threat to the accuracy and integrity of data in credit reports, and that the inaccuracies to credit reports caused by identity theft were highly damaging to innocent victims.

Here's what Sen. Richard Shelby (R-AL), Chairman of the Senate Banking Committee, and principal sponsor of the FACT Act, said during his committee's hearing on identity theft:

> Soon thereafter, when the criminals' handiwork shows up on their credit reports, they face the considerable task of restoring their good name and credit. Plainly, this crime has many victims. Firms lose profits. ***Individuals lose time, money, and peace of mind when their good name and reputation are tarnished***. [Emphasis added]
>
> In light of the serious nature of the consequences of identity theft, this issue would merit attention even if there were only a limited number of victims. Unfortunately, there are thousands of victims whose numbers are growing at an increasingly faster pace. Indeed, it has been asserted that identity theft is the fastest growing crime in America.
>
> This issue tracks across credit reporting in so many ways that it is essential that we consider it in the context of the reauthorization of the preemption provisions of the Fair Credit Reporting Act."[15]

Sen. Paul Sarbanes (D-MD), the Committee's ranking member, stated:

> Americans have strong concerns about protecting their confidential information. Honest citizens who are victims of identity theft incur a high cost in money, time, anxiety and effort to correct and restore their spoiled credit histories and good names."[16]

In testimony before the House, Equifax's representative testified in his prepared statement:

> Equifax treats consumers as valued customers; in fact, one of our fundamental operating principles is that by enlightening, enabling and empowering consumers to better manage their credit health, consumers win, business wins, and our economy wins …
>
> …Our bottom line is really very simple – as a steward of sensitive financial information about virtually every adult American – Equifax must adhere to high standards for protecting privacy; for accuracy, completeness, and timeliness; and for customer service. Anything else is not just unsatisfactory; it is a threat to our very mission and success.[17]

---

[15] "The Growing Problem of Identity Theft and Its Relationship to the Fair Credit Reporting Act" June, 19 2003
http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Testimony&TestimonyID=108&HearingID=43
[16] *Id.*
[17] Written Statement of John A. Ford, Chief Privacy Officer, Equifax, Inc., Before the House Committee on Financial Services Subcommittee on Financial Institutions and Consumer Credit, June 4, 2003, "Fair Credit Reporting Act: How It Functions for Consumers and the Economy."

I cite this brief history on identity theft to show that CRAs such as Equifax should have been were well aware that identity theft posed a direct threat to the integrity and accuracy of credit report data, and that it potentially was highly damaging to become a victim of identity theft because of its impact on credit report accuracy.

**Background & Qualifications (Curriculum Vitae Attached)**

My expertise in credit reporting stems from several of my professional activities, including:

(1) Editor/Publisher of a specialty news reporting service that covers credit reporting, Fair Information practices and related matters;

(2) Author of the book <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u>, 2nd Edition, (Privacy Times 2005), and co-author of a book with a chapter on credit reporting;

(3) An expert witness qualified by Federal and State courts in Fair Credit Reporting Act (FCRA) litigation:

(4) an expert on credit reporting who has testified before Congress on numerous occasions, including four hearings in 2003, and who has testified twice before the California legislature in regards to legislation on the use of financial data, and who regularly presents at Continuing Legal Education and other professional events; and

(5) an expert consultant to government agencies and private corporations, a member of the Consumer Advisory Council of Experian (one of the three national Credit Reporting Agencies (CRAs), and as one who has earned FCRA Certification from the National Credit Reporting Association (NCRA).

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA).  The newsletter ranges from 8-12 pages, 23 issues per year.  Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

I am author of the book, <u>Credit Scores and Credit Reports: How The System Really Works, What You Can Do</u> (2nd Edition, Privacy Times 2005).  The book has 23 Chapters, 403 pages and 369 footnotes. As the title indicates, it describes how the credit scoring and credit reporting systems work and what consumers can do to obtain their reports, read and understand them, correct errors in them and enforce their rights.  I also am co-author of <u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), which has a chapter on credit reporting.

Since the early 1990s, I have served as an expert witness in numerous FCRA cases and have been qualified by the federal courts. As an expert witness, I have had the opportunity to read thousands of pages of deposition testimony by consumer reporting agency officials and by credit grantor personnel responsible for reporting data to CRAs. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data. In fact, CRAs typically consider such procedures and practices to be proprietary and/or trade secrets. To my knowledge, the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation. Due to my access to this information, I have augmented my specialized body of knowledge on practices and procedures related to credit scoring and credit reporting.

In 2005, I testified three times before Congress – always by invitation – on issues related to the collection, maintenance, security, use and disclosure of sensitive personal data, including credit reports and other financial information.

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit," November 9, 2005[18]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[19]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[20] Senate Banking Committee, March 15, 2005

In 2003, the year in which Congress was dedicated to a major upgrade of the FCRA, I testified twice before the Senate and twice before the House, and presented once before the FTC. The hearings covered a wide range of credit reporting issues, accuracy, fairness, privacy, CRA procedures and security:

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[21]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[22]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[23]

---

[18] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[19] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[20] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[21] http://banking.senate.gov/03_07hrg/071003/index.htm
[22] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[23] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[24]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

Some of my recommendations were reflected in the final FCRA Amendments approved by Congress and signed by President Bush in December 2003.

On December 3, 2002, I testified before the California State Senate Insurance Committee. On January 29, 2003, I testified before the California State Assembly Insurance Committee. Both Committees were considering financial privacy legislation (SB 1), which ultimately was enacted by the legislature and signed into law in September 2003.

I regularly present at Continuing Legal Education or professional seminars related to the FCRA, including Glasser LegalWorks (Sept. 2004), Privacy and American Business (Feb. 2004), and the National Credit Reporting Assoc. (Nov. 2004). In 2005, I presented at separate FCRA-related seminars sponsored by the Practicing Law Institute and Texas Bar Association, and was invited back to present at Glasser LegalWorks May 2005 FCRA seminar.

Two of the three major CRAs have acknowledged that I am an expert on credit reporting as it relates to "Fair Information Practices." First developed in the United States in the late 1960s, Fair Information Practices (FIPs) standards are at the core of the FCRA and most other U.S. and European privacy and data protection laws, and serve as an internationally accepted standard for gauging privacy policy and practices.

In 1990, Equifax published "The Equifax Report on Consumers In the Information Age," a nationwide opinion survey and analysis by Louis Harris and Associates and Prof. Alan F. Westin. The report listed me as a privacy expert to whom the authors expressed appreciation for my advice on survey coverage.

In April 2002, I accepted Experian's invitation to serve on the Experian Consumer Advisory Council of Experian (formerly TRW), a national CRA and vendor of other information services. Before being disbanded in 2004, the Council met twice a year to offer non-binding advice and to discuss a host of credit reporting, marketing and other privacy-related topics.

In 2004, I passed an industry examination, thereby earning "FCRA Certification" from the National Credit Reporting Association.

Since August 1998, I have served under contract as a member of the Social Security Administration's Panel Of Privacy Experts advising the agency on a host of issues.

(Please consult the attached CV for additional information.)

---

[24] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

28

**Testimony & Expert Reports**

Within recent years, I have testified at trial, or been deposed as an expert, in the following cases:

Andrews v. Trans Union Corp. et al., Case No. 96-7369, (USDC-C.D. Calif.), concerning theft-of-identity and consumer report inaccuracies.  Expert report, deposition, trial testimony. Judge Lourdes Baird presiding.  The U.S. Court of Appeals for the Ninth Circuit specifically found that my opinion on the prevalence of identity theft was relevant to the reasonableness of CRA procedures.  (see 225 F.3d 1063 (2000)).

Suzanne Sloane vs. Equifax Information Services, LLC, et al., U.S. District Court for the Eastern District of Virginia (Alexandria Div.), Case No. CIV 1:05 cv 1272.  Expert reports. Deposition. Trial Testimony   Judge Leonie M. Brinkema presiding.

Matthew Kirkpatrick. v. Equifax Credit Information Services, et al.: U.S. District Court for the District of Oregon; No. CV 02-1197-MO. FCRA, identity theft. Expert report. Deposition. Trial Testimony.  Judge Michael W. Mosman presiding.

Sandra Cortez vs. Trans Union, LLC., U.S. District Court for the Eastern District of Pennsylvania: No. 2:05 –cv—05684-JF.  FCRA.  Expert Report. Daubert Hearing. Trial Testimony.  Senior Judge John P. Fullam qualified me to testify at trial.

Federal Trade Commission vs. Accusearch, Inc., et al., U.S. District Court for the District of Wyoming, Case No. 06CV0105-D.  FTC Section 5.  Expert Report.  U.S. Magistrate Judge William C. Beaman rejected Defendant's motion to exclude my testimony.

Eddie Silva, et al. v. Haynes Furniture Co., Inc.: U.S. District Court for the Eastern District of Virginia:  No. 4:04CV82. FCRA.  Fairness hearing testimony. Judge Walter D. Kelley, Jr. presiding.

Joi Helmes v. Wachovia Bank N.A.:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 01-81277-RGM, Chapter 7. Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Alex Campos and Michael York v. ChoicePoint Services, Inc.: U.S. District Court for the District of Georgia (Atlanta), Civ. Action No. 1-03-CV-3577-WSD.  FCRA. Expert Declaration. Fairness hearing testimony. Judge William S. Duffey, Jr. presiding.

Denis W. Stasulis v. Suntrust:  U.S. Bankruptcy Court for the Eastern District of Virginia (Alexandria), Case No: 04-12542-RGM, Chapter 7.  Post-bankruptcy credit reporting. Expert report. Deposition. Trial Testimony.  Judge Robert G. Mayer presiding.

Dwaine Perry, et al. v. FleetBoston Financial Corp.: U.S. District Court for the Eastern District of Pennsylvania: No. 04-507. FCRA. Expert Report.  Fairness hearing testimony.  Judge Berle M. Schiller presiding.

Tammy Cochran v. C&M Motors, LLC, dba I-10 Toyota, et al: U.S. District Court for the Central District of California, No. CV-03-3568FMC. FCRA. Expert Report. Trial Testimony Judge Florence-Marie Cooper presiding.

Myra Coleman v. Trans Union LLC, CA4: 98-CV-169B-B (USDC-Mississippi) FCRA. Expert report, deposition, trial testimony. Judge Neal B. Biggers presiding.

Arthur Spengler v. Sears Roebuck & Co., Case No. C-03-0557. (Circuit Court, Wicomico County, Maryland). Tort, Interference with Business Relationships. Trial Testimony. Judge D. Davis qualified me as expert on credit scoring, credit reporting and FCRA-related issues.

Judy C. Thomas v. Trans Union LLC, U.S. District Court for the District of Oregon; Case No. 00-1150-JE. FCRA. Expert report, deposition, trial testimony. Magistrate Judge John Jelderks presiding.

Scott E. Campbell v. G.E. Capital Auto Lease, Circuit Court For St. Mary's County, Maryland, Case No. 99-522. FCRA, invasion of privacy. Expert report, deposition. Judge Karen Abrams qualified me to testify, but the case settled one week before trial.

Franklin F. Grizzard, Jr. v. Trans Union, L.L.C., & Equifax Information Services L.L.C., et al.: U.S. District Court for the District of Virginia (Richmond Div.); Nos. 04-CV-625 & 04-CV-626, respectively. Expert report. Affidavit. Deposition. On the eve of trial, Judge Richard Williams rejected Defendant's motion to disqualify me. The case settled shortly thereafter.

Catherine Smith, et al. v. Progressive Corporation, et al.: U.S. District Court for the Middle District of Florida (Gainesville), Case No.1:00-CV-210-MMP. Expert Report, Declaration of Value, Fairness Hearing testimony. Judge Maurice M. Paul presiding.

Franklin E. Clark, et al. v. Experian, et al.: U.S. District Court for the District of South Carolina, Case Nos. 8:00-1217-22, 8:00-1218-22, 8:00-1219-22. Affidavit, Supplemental Affidavit (both affidavits were admitted into evidence without objection). Judge Cameron McGowan Currie presiding.

In Re: Farmers Insurance Co., Inc., FCRA Litigation, U.S. District Court for the Western District of Oklahoma, Case No. CIV 03-158-F. FCRA. Expert report, deposition.

Steven E. Beck v. Equifax Information Services, et al.: U.S. District Court for the Eastern District of Virginia: No. 1-05cv347. FCRA. Expert report, deposition.

Larry Alabran v. Capital One Services, Inc..: U.S. District Court for the Eastern District of Virginia (Richmond Division); Case No. 3:04-CV-935. Expert report, deposition.

Gail Cope v. MBNA American Bank NA: U.S. District Court for the District of Oregon; No. 04-CV-493-JE. Expert report, deposition.

_Robert Gordon Peoples v. Experian Services Corp., et al._: U.S. District Court for the Central District of California: No. CV-04-1378 CAS (Ex). Expert report. Deposition.

_Lottie Robertson v. Experian Information Services, Inc. & Capital One Bank_: U.S. District Court for the Eastern District of Michigan (Southern Div.) No. 04-72308. Expert report. Deposition.

_Barbara A. Harris v. Experian Information Solutions, Inc., and Equifax Credit Information Services, Inc_: U.S. District Court for the District of Oregon, Civil No. 01-1728-JE. FCRA. Expert reports. Deposition

_Bruce Danielson v. Experian Information Solutions_:  U.S. District Court for the Northern District of Texas, Case No: 3-04CV-1722N. FCRA. Expert report. Deposition.

_Stacy Lawton Guin, et al. v. Brazos Higher Education Service Corporation, Inc._: USDC-Minnesota – No. CV 05-668 RHK/JSM. Negligence. Security Breach. Affidavit. Deposition.

_Anthony Chin v. State Dept. Federal Credit Union_: Circ. Ct. Prince George's County (Maryland); Civ. Act. No. CAL04-12778; Tort. Deposition.  Trial testimony.

_James M. McKeown v. Sears Roebuck & Co., et al_: U.S. District Court for the Western District of Wisconsin, Civil No. Case No. 03-CV-0528 C.  Expert Report, deposition.

_Paulette Field v. Trans Union LLC, et al._, Case No. 01 C 6390 (USDC-N.D. Illinois - Eastern Div.  FCRA. Expert report.  Deposition.

_Earle E. Ausherman, et al. v. Bank of America Corporation et al._: U.S. District Court for the District of Maryland, Civil Action No. MJG-01-438.  FCRA. Expert report.  Deposition

_Jesse Klco v. Elmhurst Dodge_, U.S. District Court for the Northern District of Illinois (Eastern Division) Civil Action No. 01 C 0433.  FCRA.  Expert report, deposition.
_(David & Ruthie Keefner v. Webb Ford, Inc. & Deon L. Willis._: U.S. District Court for the Northern District of Illinois (Eastern Division), Civil Action No. 02C-4643. FCRA. Expert report. Deposition.
_Anthony & Alethea Preston v. MGIC_, U.S. District Court for the Middle District of Florida (Ocala), Case No. 5:03-cv-111-Oc-10GRJ. FCRA. Expert report, deposition.
_Bruce Butcher and Pam Butcher v. Chase Manhattan Bank, U.S.A., Inc._, U.S. District Court for District of South Carolina, Case No. 8:03-3184-26. FCRA. Expert report, deposition.

**FEE**

My fee is $250 per hour for preparation and for consulting;  $250 per hour, or a minimum of  $1,000 per day, for deposition or trial testimony, plus reasonable travel time, plus travel costs and expenses.

# *Evan D. Hendricks*

## *CURRICULUM VITAE*

**Professional Activities**

1981- Present        **Editor/Publisher** of ***Privacy Times***

Since 1981, I have been Editor/Publisher of *Privacy Times*, a biweekly, Washington-based newsletter that reports on privacy and information law, including the Fair Credit Reporting Act (FCRA). The newsletter ranges from 8-12 pages, 23 issues per year. Thus, I have researched, written, edited and published many articles on Congressional and State legislative actions, judicial opinions, industry trends and actions, executive branch policies and consumer news as they related to the FCRA.

**1992 – Present        Expert Witness**

Qualified by the federal courts in FCRA and identity theft cases. (Complete list attached). I have read extensive deposition testimony by credit bureau and credit grantor personnel. This is significant because CRAs and credit grantors do not openly discuss or publish information on their procedures and practices for handling personal data, and the best (and possibly only) sources for finding candid descriptions of CRAs' and credit grantors' procedures and practices in relation to credit reporting data are the depositions of CRA and credit grantor employees in FCRA litigation.

**1998 – Present        Privacy Expert Consultant, U.S. Social Security Administration**

Regularly review policies and practices in relation to the collection, use and disclosure of personal data and Social Security numbers and provide feedback and recommendations.

**2002 – 2004    Member, Experian Consumer Advisory Council**

Along with other Council members, I provide an outsider's view on credit reporting, marketing and other privacy issues.

## July – October 2002        Consultant to U.S. Postal Service

Working with the USPS's Chief Privacy Officer, I assisted in reviewing and editing the re-write of the USPS's Privacy Act notices, with an emphasis on "Plain English."

---

**Evan Hendricks        P.O. Box 302        Cabin John, MD 20818**
**(301) 229 7002  (301) 229 8011 [fax]  evan@privacytimes.com**

---

**Recent Testimony Before Congress & The FTC**

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.[25]

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006[26]

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005[27]

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005[28]

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information,"[29] Senate Banking Committee, March 15, 2005

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003[30]

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003[31]

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003[32]

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003[33]

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**Books**
Credit Scores and Credit Reports: How The System Really Works, What You Can Do [2nd Edition] (Privacy Times, 2005)

---

[25] www.house.gov/apps/list/hearing/financialsvcs_dem/ht061907.shtml
[26] http://energycommerce.house.gov/108/Hearings/06202006hearing1938/Hendricks.pdf
[27] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=425
[28] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=407
[29] http://banking.senate.gov/index.cfm?Fuseaction=Hearings.Detail&HearingID=144
[30] http://banking.senate.gov/03_07hrg/071003/index.htm
[31] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=229
[32] http://judiciary.senate.gov/testimony.cfm?id=983&wit_id=2790
[33] http://financialservices.house.gov/hearings.asp?formmode=detail&hearing=202

<u>Your Right To Privacy: A Basic Guide To Legal Rights In An Information Society</u> (2nd Edition, Southern Illinois University Press, 1990), (Includes a chapter on credit reporting)

<u>Former Secrets: Government Records Made Public Through The Freedom of Information Act</u> (Campaign For Political Rights, 1982)

**International Lectures**

24th International Conference of Data Protection & Privacy Commissioners (Cardiff, Wales – Presentation published in conference proceedings, 2002)
The 23rd International Conference of Data Protection Commissioners (Paris, La Sorbonne – Presentation published in conference proceedings, 2001)
The 22nd Annual Conference on Data Protection (Venice, Italy -- 2000)
The 16th Annual Conference on Data Protection (The Hague, The Netherlands -- 1994).
In the 1980s, served as an expert consultant to both the Privacy Commissioner of Canada and Privacy Commissioner of Australia.

**Presentations/Instruction At Recent CLE & Professional Seminars**

"11th Annual Consumer Financial Services Litigation," Practicing Law Institute, March 20-21, 2006 (New York City)
"Bankruptcy Roundtable," and, "Fair Credit Reporting Act Roundtable," National Consumer Law Center, October 27, 2005
"Advanced Consumer Litigation," Texas Bar CLE, Feb. 10-11, 2005
"Financial Privacy Litigation," (Impact of FACT Act), Practicing Law Institute, February 28- March 1, 2005 (New York City)
"The New FACT Act: Challenge & Oppty.," Privacy & American Business, Feb. 9-10, 2004
"Understanding the FACT Act And The Impact of Multi-Agency Rulewriting Process," Glasser LegalWorks, Sept. 28-29. 2004
"12th Annual National Conference," National Credit Reporting Association, Nov. 10-12, 2004

**Professional Societies**

Past President & Board Member, American Society of Access Professionals www.accesspro.org

**Industry Certification**

FCRA Certification, National Credit Reporting Association (www.ncrainc.org).

**Media**

In addition to being a paid consultant and special guest on CNN's IMPACT news in 1996, I am quoted regularly by major and small newspapers (including The Washington Post, New York Times, Wall Street Journal, Chicago Tribune, Los Angeles Times, Newsweek and Money Magazine), regarding issues of privacy generally and the privacy implications of consumer reporting specifically. I have appeared on National Public Radio, PBS NewsHour with Jim Lehrer, ABC Nightline and World News Tonight, NBC Nightly News, CBS Evening News, CNN News Watch, CNBC, MSNBC, Fox News, various local affiliates, and the Oprah Winfrey Show and Geraldo, regarding these issues as well.

**Education**

Bachelor of Arts, Columbia College, Columbia University, New York, N.Y. (1979)

**MATERIALS CONSIDERED**

In specific preparation for this case, I have reviewed the following:

Plaintiff's Complaint
Plaintiff's credit reports
Various correspondences by Plaintiff & Defendant
Internal documents produced by Defendant
Depositions of Defendant's corporate representatives and employees
Deposition of Plaintiff

I also generally rely upon:

The Fair Credit Reporting Act & Consumer Credit Reporting Reform Act of 1996
Fair Credit Reporting Act (w/ Companion Disk & 2000 Cumulative Supplement, National Consumer Law Center, 1998 (Boston)
Credit Scores and Credit Reports: How The System Really Works, What You Can Do (2nd Edition, Privacy Times 2005),

My opinions in this case are also based on my 29-year profession of following privacy developments including those relating to the consumer reporting and information broker industry and the criminal justice system as a journalist, editor, publisher and privacy expert.  My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**Executed This The 11th Day of July 2007, in Bethesda, Maryland**

_____
**/s/**
**Evan D. Hendricks**
PO Box 302
Cabin John, MD 20818
(301) 229 7002

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served the foregoing **PLAINTIFF'S RULE 26(a)(2)**

**DISCLOSURE** on:

Jeffrey Edelson
Markowitz Herbold et al
1211 SW 5th Ave Ste 3000
Portland OR  97204
    Of Attorneys for Defendant Equifax Information Services, LLC

    [  ]  Via First Class Mail

    [  ]  Via Facsimile

    [  ]  Via Hand Delivery

    [X]  Via E-Mail (CM/ECF)

Dated this 11th day of July, 2007.

                    /s/ Justin M. Baxter

                    _____
                    Justin M. Baxter, OSB #99217
                    (503) 297-9031 (Telephone)
                    (503) 291-9172 (Facsimile)
                    justin@baxterlaw.com
                    Of Attorneys for plaintiff Valentine

Page 2 **PLAINTIFF'S RULE 26(a)(2) DISCLOSURE**